Max Edmon GLENN, et al., Appellants

v.

Claude A. LUCAS and Bonnie Lucas, Appellees.

No. 06–12–00006–CV.

Court of Appeals of Texas, Texarkana.

Submitted June 8, 2012.

Decided Aug. 1, 2012.

Kenneth B. Florence, Jr., Attorney at Law, Center, TX, R. Collin Underwood, Robert Underwood, Underwood Law Offices, Carthage, TX, for Appellants.

George H. Pigg, Mettauer Shires & Adams, LLP, Center, TX, for Appellees.

Before MORRISS, C.J., CARTER and MOSELEY, JJ.

## OPINION

Opinion by Justice MOSELEY.

This case is an appeal of a suit brought by Claude A. Lucas and wife, Bonnie Lucas, involving the title to the surface and some appurtenant mineral rights to a called 63.6–acre tract of land in Shelby County, Texas.[1] In a suit in trespass to

---

1. Originally appealed to the Twelfth Court of Appeals, this case was transferred to this

try title against multiple defendants, the Lucases were granted judgment. Max Edmon Glenn and others have appealed, complaining of nondeterminative issues. Instead of any complaint about lack of the usual requirement of proof of title as is common in suits in trespass to try title, as explained below, they raise four questions with respect to the effect of a 1932 judgment foreclosing a vendor's lien in favor of the Lucases' alleged predecessor in interest. Addressing only the questions posed on appeal, we reluctantly affirm the trial court's judgment.

## I. A Step Back in Time

This trespass to try title case requires travel through time to study the historical transition of 109 acres of land once owned by G.C. Estes, a portion of which was apparently acquired by the Lucases. According to the representations of the parties, in the 1920s Estes owned the following property in fee simple:

> BEGINNING at a middle N.E. corner of said James M. Graham Survey, being the S.W. corner of one of the surveys of m. M. Vann, a white oak stump on the S. bank of Mill creek; THENCE S. 1 1/2 W. along said James M. Graham's E.B. L.568 vrs. to stake on said line at the N.E. corner of a 76 1/4 acre tract conveyed by M.C. Estes and wife to Ace Biggar a post oak 12″ brs. N. 15 E. 9 vrs. mkd X; THENCE S. 66 W. with Ace Biggar's N.W. Bdry. line 528 vrs. to his N.W. corner and the middle E. corner of an 88–1/3 acre tract conveyed by M.C. Estes to Peter Wankan on a branch bearings a maple mkd X; THENCE down said branch with its meanders N. 15 1/4 W. 380 vrs. to Peter Wankan's N.E. corner on said branch a beech brs. N. 86 E. mkd X; THENCE S. 85 W. with said Wankan's N.B.L. at 99 vrs. middle of a road at 640 vrs. stake on the N.W. Bdry. line of said James M. Graham Survey on the bank of Mill creek, bearings a lynn mkd X; THENCE N. 45 E. along said James M. Graham's N.W. bdry. line 934 vrs. to stake, old bearings gone being the S.W. corner of a 15 acre tract (13 acres being on J.M. Graham) conveyed by Geo. C. Estes to J.B. Burns; THENCE S. 65–3/4 E. with the breaks of the creek 104 vrs. stake a white oak mkd X; THENCE N. 89 E. 56 vrs. a large sweetgum mkd X (now down); THENCE S. 66 S. at 100 vrs. a hickory mkd X; THENCE S. 30 E. at 50 vrs. stake a forked elm brs N. 30 W, mkd X; THENCE N. 71 1/2 E. 196 vrs. stake in the Center and San Augustine road a small pine brs. S. 71 1/2 W. mkd X; THENCE S. 25 E. along said Graham's N.E. Bdry. line and nearly with Center and San Augustine road 156 vrs. to the place of beginning, containing 109 acres of land, more or less.

(hereinafter referred to as Property). It appears that Estes sold the above tract to W.M. Bailey on December 5, 1925, with at least a portion of the purchase price being secured by a series of vendor's lien notes given by Bailey to Estes. There were eight promissory notes in the sum of $250.00 each and a final promissory note in the sum of $300.00. Each of the promissory notes had maturity dates of November 15 each of the succeeding years, the first note maturing on November 15, 1926, and the last promissory note maturing and payable on the same calendar date in

Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* Tex. Gov't Code Ann § 73.001 (Vernon 2005). We are unaware of any conflict between precedent of the Twelfth Court of Appeals and that of this Court on any relevant issue. *See* Tex. R.App. P. 41.3.

1934.[2] The promissory notes (bearing interest at ten percent per annum and providing for attorney's fees in the event of default) contained a provision that "the maturity and failure to pay one or any of said notes matured all of them."

The deed given by Estes to Bailey reserved an "undivided one-half interest in and to all of the oil, coal, or other minerals on or under" the realty that was conveyed and contained the usual wording which recited that the vendor's lien would remain in force until payment in full of all of the promissory notes. Estes then assigned the first four of the nine notes to H.F. Byford, with acknowledgement that "the lien herein assigned is superior to the lien to secure the other five notes not herein assigned."

On October 2, 1930, Bailey and his wife conveyed the Property back to Estes in consideration of the cancellation and surrender of the vendor's lien notes. The following month, Estes conveyed the same called 109–acre tract to Harvey Hughes and wife, Willie Mae Hughes, upon the Hugheses' assumption of the notes previously payable by Bailey; Estes made a similar reservation of one-half of the mineral estate. Estes and Byford agreed to modifications and extensions of the promissory notes.

On January 26, 1931, the Hugheses conveyed their one-half undivided interest in the mineral estate to I.F. Bright. Bright conveyed a one-fourth interest in the mineral estate to Josephine Glenn on April 11, 1931.[3] The following month, Josephine Glenn conveyed a one-eighth interest to O.M. Glenn and his wife. On June 4, 1931, Bright conveyed his remaining one-fourth interest in the mineral estate to L.S. Buchanon.

The Hugheses then defaulted in the payment of the promissory notes payable to Byford, causing Byford to file suit in 1932 in the District Court of Shelby County against Estes and the Hugheses to obtain judicial foreclosure of the vendor's lien notes held by him. At the time suit was filed, Estes owned one-half of the undivided mineral interest, Josephine Glenn owned one-eighth, O.M. Glenn and wife owned one-eighth, and L.S. Buchanon owned one-fourth.[4] While Estes, the Hugheses, Josephine Glenn, and Mr. and Mrs. Glenn were apparently eventually included as defendants in the suit, L.S. Buchanon was not included as a party.[5]

On December 31, 1932, Byford was granted judgment against Estes and the Hugheses for foreclosure of the vendor's lien held by him, reciting the amounts due under said notes and confirming that his lien was superior to that held by Estes. The judgment recited that Byford was awarded an order of sale as under execution to satisfy his judgment. In addition, the lien held by Byford was declared to be "superior in every way to any mineral rights, royalty deeds, and easements heretofore attempted to be executed by Harvey Hughes to Josephene [sic] Glenn, O.M.

2. Apparently, the promissory notes were not additionally secured by a deed of trust.

3. On March 2, 1931, Bright conveyed a 1/32 interest in the mineral estate to Josephine, but this interest was reconveyed to Bright on July 9, 1931.

4. There were incidental claims not related to the title against a bank as well. In 1952,

Bright quitclaimed any interest he might have had in the property to Estes, even though Bright had conveyed his entire interest in 1931.

5. Although the Lucases alleged that Bright was also sued, the trial court's judgment fails to mention Bright as a party to the 1932 suit.

Glenn, Mrs. O.M. Glenn, or any other person or persons."

Byford released Estes from the judgment a few days later in exchange for Estes's interest in the Property (a one-half undivided interest in the mineral estate). All parties in this case concur that no sale as under execution occurred as a result of that judgment.

## II. The Lucases' Suit

On October 14, 2010, the Lucases instituted suit against multiple defendants [6] (to whom reference is made hereafter as the Successors) whom the Lucases asserted were making claims to various mineral interests in the following real estate:

> 63.6 acres, more or less, out of the J.M. Graham Survey, A–254, Shelby County, Texas, and being more particularly described as 73.6 acres, more or less, and being the First Tract and Second Tract in that certain General Warranty Deed dated July 3, 1972, from T.J. Gillam and Joe Davis Foster to Claude A. Lucas, recorded in Volume 483, Page 28 of the Real Property Records of Shelby County, Texas.

(hereinafter referred to as the 63.6 acres).

Numerous other parties (to whom reference is hereinafter made as Intervenors) who claimed to own fractional interests in the mineral estate brought pleas in intervention.[7]

The suit was originally pled by the Lucases in the alternative, claiming first that it was a suit to remove clouds from the title to the property and alternatively claiming it to be a suit for declaratory judgment. However, following complaints by the Successors and Intervenors that the true nature of the lawsuit was trespass to try title and apparently recognizing that a trespass to try title action is the exclusive method by which to resolve competing claims to property, the Lucases filed a

---

**6.** They sued these defendants who claimed the following interests in the mineral estate of the property: Jimmie Blanche Glenn (5/32 mineral interest), Tracey Buchanan Oakley (1/24), Teri Kathleen Buchanan Knetter (1/24), Thomas Wade Buchanan (1/64), Wendy Funk Buchanon (1/64), Robin Buchanon Rogers (1/64), Rita Buchanon Aspen (1/64), Timothy Allen Buchanan (1/64), Patrick Edward Buchanan (1/64), Michael Joseph Buchanan (1/64), Peter Raymond Buchanan (1/64), Rosemary Buchanan as "life estate owner of a 1/24th mineral interest," Gladys Gilchrist Reeves (1/224), Paula Wright Rozell (1/1792), Patricia Wright Helm (1/1792), Linda Wright Warren (1/1792), Floyd Everett Wright (1/1792), Bobby Lloyd Wright (1/1792), Donald William Wright (1/1792), Kathryn Wright Fought (1/1792), Joe Charles Pendleton, Jr. (1/1792), Teddy Paul Waller (1/2688), Angela Waller McKamie (1/2688), Sherrie Waller Jones (1/2688), Brenda Waller Thomas (1/2688), Ercyle Waller Henderson (1/672), Roger Melvin Waller (1/672), John Austin Nagel (1/288), Charles Glenn Nagel (1/288), Harold W. Breaux (1/192), Mary Glenn Nickel (1/96), Max Edmon Glenn (1/96), Kindel

Breaux Reeves (1/384), Alice Gilchrist Chin (1/4032), and Robert Bruce Neal (1/4032). The trial court dismissed the following parties who disclaimed their interest in the Property pursuant to the Lucases' notices of nonsuit: Elwanda Glenn Allums, Frances Gilchrist Snider, Ashton Breaux, Gerald A. Beathard, as Trustee of Gerald A. and Brenda N. Beathard Living Trust Default judgment was entered against Joe Charles Pendleton, Jr., Alice Gilchrist Chin, Angela Waller McKamie, Sherrie Waller Jones, and Roger Melvin Waller, divesting them of interest in the property and finding they had no authority to enter into the Noble lease agreement.

**7.** These persons and the fractional interests they claim were: Dickie Gilchrist (1/224), Billy Carroll Neal (1/1792), James Ray Neal (1/1792), David Gilchrist (1/1792), Rickie Gilchrist (1/1792), Dorothy Faucett (1/896), Fred L. Johnson (1/672), Jerry Conway (1/1304), Luther Conway (1/1304), James Conway (1/1304), Vernon Conway (1/1304), Charles Conway (1/1304), Jessie Milford (1/1304), Vivian Campbell (1/672), and Ura Johnson Lovell (1/672).

post-trial amendment adding trespass to try title as a third cause of action. *Ramsey v. Grizzle*, 313 S.W.3d 498, 503 (Tex. App.-Texarkana 2010, no pet.); *see Berg v. Wilson*, 353 S.W.3d 166, 180 (Tex.App.-Texarkana 2011, pet. denied); TEX. PROP. CODE ANN. § 22.001 (West 2000).

The controversy arose because the Successors had entered into an oil, gas, and mineral lease with Noble Energy which was assigned by Noble to Devon Energy Production Company, LP. The suggestion that there was an issue with title came about as a result of a title search performed by Devon, who had already begun production of natural gas from the premises.

The Lucases claimed that their predecessor in interest was Byford.[8] The petition further alleged that the Successors' predecessors in interest were Josephine Glenn, Mr. and Mrs. O.M. Glenn, and L.S. Buchanon, that their interest was subject to Byford's lien which was foreclosed by virtue of the 1932 judgment, and that the Successors "had no right, title, or interest in or to the plaintiff's property, and did not have authority to enter into an oil, gas and mineral lease for the" 63.6 acres.

Claude Lucas was the only witness at the bench trial. He testified that he purchased the property "in 1972 from Tom Gillam and Joe Davis Foster." No documentary evidence was introduced to prove up that claim and Claude indicated that he had not even brought that deed with him to trial. The record merely contains a property description, which fails to demonstrate that there was any property transfer to the Lucases. Even if we were to assume that this is the property description in the 1932 lawsuit brought by Lyman, and if we assume further that the same

property in that 1932 lawsuit is the realty eventually transferred to the Lucases, there is nothing to indicate the scope of any conveyance to the Lucases (i.e., nothing indicates whether the transfer to the Lucases purported to be a conveyance of the surface estate only, the mineral estate only, or all or part of both). Although the Successors and Intervenors apparently claim only interests in the mineral estate of the Property, there is no evidence to indicate what percentage of interest the Lucases might actually possess, if any, to the mineral estate.

 This paucity of proof of title would ordinarily dictate that the Lucases would fail in their claim to recover. "To maintain an action of trespass to try title, the person bringing the suit must have title to the land sought to be recovered." *Ramsey*, 313 S.W.3d at 505 (citing *Brownlee v. Sexton*, 703 S.W.2d 797, 799–800 (Tex.App.-Dallas 1986, writ ref'd n.r.e.); *Wall v. Carrell*, 894 S.W.2d 788, 797 (Tex. App.-Tyler 1994, writ denied)). "A plaintiff[']s right to recover depends on the strength of his or her own title, not the weaknesses of the title of his or her adversary." *Id.* (citing *Rogers v. Ricane Enters., Inc.*, 884 S.W.2d 763, 768 (Tex.1994); *Brownlee*, 703 S.W.2d at 799–800; *Land v. Turner*, 377 S.W.2d 181, 183 (Tex.1964); *Wall*, 894 S.W.2d at 797). "[T]he plaintiff is not entitled to recover unless the plaintiff's own title is effectively disclosed." *Wall*, 894 S.W.2d at 797. Ordinarily, a plaintiff may recover (1) by proving a regular chain of conveyances from the sovereign, (2) by proving a superior title out of a common source, (3) by proving title by limitations, or (4) by proving prior possession and that the possession has not been

---

8. As discussed below, no evidence in the record substantiates this claim, even to the extent that the real property described in the lawsuit cannot be affirmatively identified as being the same property in the suit brought by Byford over seventy years previously.

abandoned. *Rogers*, 884 S.W.2d at 768; *Turner*, 377 S.W.2d at 183. Where, as here, the parties agree as to a common source, i.e., G.C. Estes, "it is incumbent upon the plaintiff to discharge the burden of proof resting upon him to establish superior title." *Davis v. Gale*, 160 Tex. 309, 330 S.W.2d 610, 612 (1960). Upon the failure of a plaintiff to establish superior title in a trespass to try title suit, the proper course of action is for the trial court to enter a "take-nothing" judgment. *Hunt v. Heaton*, 643 S.W.2d 677, 679 (Tex. 1982). A take nothing judgment in a trespass to try title suit operates to divest the plaintiff of all its title to its interest in the lands in controversy and to vest the same in the defendant. *Halbert v. Green*, 156 Tex. 223, 293 S.W.2d 848 (1956).

Despite the obvious want of sufficient proof of title, the trial court entered judgment that the Lucases recover "the title to and possession of" the "property and minerals interest" in the 63.6 acres. In its findings of fact, the court stated:

> Because the parties stipulated to a common source of ownership of the Property there was no need to file headright certificate, land scrip, or other ownership evidence. All parties claim ownership on chains of title through G.C. Estes. All parties provided their respective deed instruments and/or citations through which they claim ownership.[9]

9. We believe this statement was made without evidence in support thereof.

10. The judgment was appealed by Robin Buchanan Rogers, Rosemary Buchanan, Tracey Buchanan Oakley, Teri Kathleen Buchanan Knetter, Thomas Wade Buchanan, Wendy Funk Buchanan, Rita Buchanan Aspen, Timothy Allen Buchanan, Patrick Edward Buchanan, Michael Joseph Buchanan, and Peter Raymond Buchanan (who collectively refer to themselves as the Buchanan Appellants), and Max Edmon Glenn, Kindel Breaux Reeves, Harold W. Breaux, Jimmie Blanche Glenn,

After describing the chain of title accurately through 1932, the trial court included as findings of fact the conclusory statement that "Lucas followed in chain of title from H.F. Byford" and that "Lucas provided sufficient evidence of his superior title to the Property." These statements are not specifically challenged on appeal, as it was apparently assumed in the findings of fact—without proof to support it—that Byford was the Lucases' predecessor in interest.

This case would be a relatively simple one if issues of legal and factual sufficiency to support the judgment were raised. Nevertheless, Appellants[10] pose the following inconsequential questions as points of error:

I. Does the failure to consummate a judicially ordered foreclosure sale by the sheriff, render a purported foreclosure judgment legally ineffectual?

II. Is an election to pursue the remedy of judicial foreclosure forever binding, and preclude a later attempt to assert the alternate and mutually exclusive remedy of rescission of contract?

III. Should the Buchanan Appellants' predecessor in title, Mr. L.S. Buchanan been [sic] included as a Defendant in the 1932 judicial foreclosure lawsuit?

Gladys Gilchrist Reeves, Paula Wright Rozell, Patricia Wright Helm, Linda Wright Warren, Floyd Everett Wright, Bobby Lloyd Wright, Donald William Wright, Kathryn Wright Fought, Teddy Paul Waller, Erycle Waller Henderson, Robert Bruce Neal, Dickie Gilchrist, Billy Carroll Neal, James Ray Neal, David Gilchrist, Rickie Gilchrist, Dorothy Faucett, Fred L. Johnson, Jerry Conway, Luther Conway, James Conway, Vernon Conway, Charles Conway, Jessie Milford, Vivian Campbell, and Ura Johnson Lovell.

IV. Was there an actual Deed in Lieu of Foreclosure from Harvey Hughes to H.F. Byford[?].

The Appellants do not raise a point of error regarding sufficiency of the evidence. Reading the Appellants' briefs broadly, we interpret these general questions as complaints upon the trial court's finding that the 1932 judgment "divested" the defendants in that suit "of any mineral interest held" and the conclusion that "H.F. Byford retained superior title to the Property, vis-à-vis Defendants' predecessor in title, through the vendor's liens granted by Harvey Hughes and wife, Willie Mae Hughes." Appellants insist that the "facts before the Court are *undisputed* and that the Court can resolve this appeal *de novo*" because the issues only require us "to determine the legal effect of various judgments, deeds, releases, etc."

### III. Analysis of Ancient Issues

■ The key to these specific questions lies in the unique nature of a vendor's lien. Here, the purchase-money vendor's lien [11] was a charge imposed by contract to secure payment of the purchase price of real property. *See Jones v. Bank United of Tex., FSB*, 51 S.W.3d 341, 343 (Tex.App.-Houston [1st Dist.] 2001, pet. denied). "The vendor, or seller, retains the superior title, and the vendee, or buyer, merely has an equitable right to acquire title by carrying out the agreement." *Id.* (citing *Walton*, 956 S.W.2d at 651). The deed from Estes to Bailey, and later Estes to the Hugheses, contained the following words, which were sufficient to establish a valid vendor's lien: "it is expressly agreed and stipulated that the Vendor's lien is retained against the above described property ... until the above described notes and all interest thereon are fully paid accord-

ing to their face and tenor, effect and reading, when this deed shall become absolute." *See Walton*, 956 S.W.2d at 651. Thus, Byford retained superior legal title to the property. *See Lusk v. Mintz*, 625 S.W.2d 774, 775 (Tex.App.-Houston [14th Dist.] 1981, no writ).

As pointed out in *Lusk*, the court in *Bunn v. City of Laredo*, 245 S.W. 426, 429 (Tex.Comm'n App.1922, judgm't adopted), said:

> It has been the uniform holding of our courts from the earliest times that, however absolute may be the terms of such conveyance, the contract of sale is treated as executory between the vendor and vendee and those holding under them until the purchase money is fully satisfied; and that, in addition to all other remedies to enforce payment of the purchase money, the vendor has the alternative remedy, so long as the purchase money is not paid, to rescind the contract of sale and recover the land upon the strength of his superior title as an unsatisfied vendor. This remedy to rescind and resort to the superior legal title has uniformly been held to be separate and distinct from and wholly independent of the remedy to subject the land to the payment of the purchase money by sale under foreclosure.

625 S.W.2d at 776. "The vendor has a choice of remedies on the vendee's default. The vendor may sue for his money, he may rescind the contract and take possession, or he may sue to recover title and possession." *Walton*, 956 S.W.2d at 652; *Lusk*, 625 S.W.2d at 775–76.

However,

> [i]n order for the holder of a series of vendor's lien notes to be entitled to the legal remedy of rescinding the contract

---

11. This type of vendor's lien is also known as a contract lien. *Walton v. First Nat'l Bank of*

*Trenton*, 956 S.W.2d 647, 651 n. 2 (Tex.App.-Texarkana 1997, pet. denied).

and recovering the land, he must own all of the series of notes at the time he seeks to rescind. If any of the series of notes are owned by other parties, then he does not have a legal right to rescind the contract, but has only the legal right to obtain judgment on the notes with a foreclosure of his lien.

*White v. Bell*, 290 S.W. 849, 851 (Tex.Civ. App.-Waco 1927, writ ref'd). Since Byford only held four notes out of the series of nine, he chose to pursue foreclosure in the 1932 suit.[12]

 Appellants argue that because the foreclosure sale was incomplete, the "purported foreclosure judgment" was rendered "legally ineffectual."[13] We disagree for two reasons. First, the Hugheses and Estes conveyed any interest they had in the Property to Byford immediately after the trial court's judgment to avoid "liability" under the suit. Hence, a sheriff's sale of the property was not required as to these parties since "[a] deed given in satisfaction of a debt may serve as a convenient, efficient transfer of title upon default of a debt." *Morrison v. Christie*, 266 S.W.3d 89, 92–93 (Tex.App.-Fort Worth 2008, no pet.) (citing *Flag–Redfern Oil Co. v. Humble Exploration, Inc.*, 744 S.W.2d 6, 8 (Tex.1987)).[14]

 Second, under this lien, we have established that legal title to the

Property belonged always to Byford. Equitable title is defined as "a right, enforceable in equity, to have the legal title to real estate transferred to the owner of the right upon the performance of specific conditions," here the payment of the notes. *City of Houston v. Guthrie*, 332 S.W.3d 578, 588 (Tex.App.-Houston [1st Dist.] 2009, pet. denied). "An equitable title is the present right to the legal title." *Carmichael v. Delta Drilling Co.*, 243 S.W.2d 458, 460 (Tex.Civ.App.-Texarkana 1951, writ ref'd). In the same vein, the purchaser under a contract for conveyance of property does not acquire equitable title to the property until he pays the purchase price and fully performs the obligations under the contract. *White v. Hughs*, 867 S.W.2d 846, 849 (Tex.App.-Texarkana 1993, no writ) (citing *Johnson v. Wood*, 138 Tex. 106, 157 S.W.2d 146, 148 (1941)); *Cullins v. Foster*, 171 S.W.3d 521, 534 (Tex. App.-Houston [14th Dist.] 2005, pet. denied). Thus, Appellants' predecessors in interest had only a potential right, which was lost as explained below.[15] Because Appellants had no legal or equitable title to the property, consummation of the foreclosure sale was not required to divest them of *title*, after the 1932 judgment did so.

 Hughes purported to convey a one-half interest in the mineral estate to

---

12. We need not address the Appellants' arguments regarding election of remedies.

13. They cite to the case of *Zeigler v. Sawyer*, 16 S.W.2d 894, 896–97 (Tex.Civ.App.-Amarillo 1929, writ ref'd), to support their proposition. *Zeigler* is easily distinguishable because the case involved a mortgage, which is merely a lien which vests no estate in the mortgagee. *Id.* at 896.

14. The Appellants ask whether there was "an actual Deed in Lieu of Foreclosure" from the Hugheses to Byford. A "deed-in-lieu of foreclosure is not a specific type of deed, such as a special warranty deed or a quitclaim deed;

there is no such deed as a deed-in-lieu of foreclosure." *Morrison*, 266 S.W.3d at 92.

15. If a vendee, here the Hugheses, sells all or a part of the interest, "the conveyance is actually a transfer of an equitable interest susceptible to recission." *Flag–Redfern*, 744 S.W.2d at 8. Thus, the Hugheses' conveyance to Bright, and Bright's subsequent conveyances to Buchanon and Josephine, as well as Josephine's conveyance to O.M. Glenn and wife, were merely conveyances of an equitable right, which was expressly subject to Byford's superior lien.

Bright, who in turn deeded a one-fourth interest to Buchanon and Josephine Glenn (who purported to convey half of her interest to O.M. Glenn and wife). The Buchanon Appellants ask what the effect of the foreclosure was upon Buchanon, who was not made a party to the suit. "[W]hen a lien is once created by an express agreement, the land is not to be disencumbered, save by a payment of the debt or a contract for the release or discharge of the incumbrance." *Kendall v. Johnston,* 258 S.W. 1093, 1094 (Tex.Civ.App.-Amarillo 1924, no writ). Estes contracted with Byford that his notes should have priority. This "agreement would have been notice to the appell[ants'] [predecessors in interest] and binding upon them."[16] *Id.* As Bright could not convey more than his interest (which was a mere unmatured equitable right to an undivided one-half interest in the mineral estate, subject to Byford's lien), Buchanon's[17] interest was also a mere unmatured equitable right subject to the lien.

Although Buchanon had an unmatured equitable right, he was not a necessary party to the foreclosure suit. *Whiteside v. Bell,* 162 Tex. 411, 347 S.W.2d 568, 570–71 (1961). However, he retained the right to pay off the indebtedness and was entitled to intervene in the suit. *Id.* The record contains no suggestion of any actions taken with respect to Buchanon's interest. Caselaw suggests that Buchanon's "equitable right to complete payment of the pur-

chase price and acquire title was barred by laches"[18] after too many years "had elapsed from the time of entry of the foreclosure judgment." *Id.* at 571–72 (citing *Williams v. Coleman–Fulton Pasture Co.,* 157 S.W.2d 995 (Tex.Civ.App.-San Antonio 1941, writ ref'd w.o.m.)). Because Buchanon did not assert any interest, "it would be inequitable to recognize the validity of" his claim. *Id.* at 572.

We note that this matter was not originally brought as a suit in trespass to try title, but during the hearing on the merits, the parties agreed that trespass to try title was the proper legal vehicle to carry the lawsuit. By agreement of the parties, the Lucases made a post-hearing amendment to their pleadings to include a request for relief in trespass to try title. Although the proof of title required in a trespass to try title was not proffered at trial, the Successors have raised no issue either before this Court or below regarding the sufficiency of the evidence to support a claim in trespass to try title. It is "axiomatic that an appellate court cannot reverse a trial court's judgment absent properly assigned error." *Pat Baker Co. v. Wilson,* 971 S.W.2d 447, 450 (Tex.1998).

## IV. Conclusion

We affirm the trial court's judgment.

---

16. The liens were recorded in the real property records. "The rule is settled by the decisions of the courts that the written assignment of vendor's lien notes is such an instrument as is required by our registry laws to be recorded in order to be effectual against subsequent purchasers for a valuable consideration without notice, and that the record of such an instrument is constructive notice to such subsequent purchaser." *Havis v. Thorne Inv. Co.,* 46 S.W.2d 329, 331 (Tex.Civ.App.-Amarillo 1932, no writ).

17. The Lucases argue that "[s]ubvendees did not have equity in the subject property and their rights were extinguished by the vendee, Harvey Hughes, re-conveying his interest back to Lucas' predecessor-in-title." We note that at the time of conveyance, the Hugheses' interest was only that of the surface estate of the Property.

18. The same is true regarding the interests of Josephine Glenn, Mr. and Mrs. O.M. Glenn.